IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATHANIEL M. COSTLEY, SR.,     :

     Plaintiff,         :

v.                           :
                             Civil Action No. GLR-16-1447
THE CITY OF WESTMINSTER,     :
et al.,

                       :

     Defendants.

                       :

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants', the City of Westminster, the Westminster City Police Department,[1] Lieutenant Thomas Kowalczyk, and Officer Patricia Parks[2] (collectively, the "Westminster Defendants"), Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 7).[3] The Motion is fully briefed and ripe for disposition. No hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons that follow, the Court will grant the Motion.

---

[1] Local police departments are not legal entities amendable to civil suit -- the local police department's parent municipal corporation is the proper defendant. See Revene v. Charles Cty. Comm'rs, 882 F.2d 870, 874 (4th Cir. 1989) (concluding the Charles County Board of Commissioners, as the governing body of Charles County, Maryland, was the proper defendant, not the Charles County Sheriff's Office); Savage v. Mayor of Salisbury, No. CCB-08-3200, 2009 WL 1119087, at *3 (D.Md. Apr. 22, 2009) (concluding the City of Salisbury, not the Salisbury Police Department, was the proper defendant). Thus, the Court will enter judgment for the Westminster Police Department on all claims because the City of Westminster is the proper municipal defendant.

[2] The Court will refer to Lieutenant Thomas Kowalczyk, and Officer Patricia Parks collectively as the "Officers."

[3] Christina Steiner is also a Defendant in this case. She does not join in the Westminster Defendants' Motion. She filed an

## I.   BACKGROUND[4]

On November 15, 2015, pro se Plaintiff Nathaniel M. Costley, Sr. called Defendant Christina Steiner to explain that he "was tired of fighting over their child and wanted the fighting to end." (Compl. ¶ 10, ECF No. 1).  During the conversation, Costley also told Steiner that "he was thinking about moving from his current residence and that all the fighting between them would soon be over because [Costley] could not take it anymore."  (Id.).  Steiner began asking questions about their minor child's wellbeing and encouraged Costley to reconsider his decision to relocate.  (Id.).

Following the conversation with Costley, Steiner called the Westminster Police Department and alerted them that Costley told Steiner he was going to commit suicide.  (Id. ¶ 11).  Meanwhile, Costley drove to a neighbor's house to collect money Costley had loaned.  (Id. ¶ 12).  While at the neighbor's house, Costley's cousin, Justin Carter, arrived and asked Costley to follow him back to Costley's house. (Id.).  Costley obliged.  (Id.).

As Costley approached his house, he observed a marked Westminster Police Department vehicle in front of his house. When Costley pulled into his driveway, "he was completely caught off

_____

Answer on August 31, 2016.  (ECF No. 9).

    [4] Unless otherwise noted, the facts outlined in this section are set forth in Costley's Complaint (ECF No. 1).  To the extent the Court discusses facts that Costley does not allege in his Complaint, they are uncontroverted and the Court views them in the light most favorable to Costley. The Court will address additional facts in the Discussion section.

guard by three officers." (Id. ¶ 13). One officer "blocked [Costley's] vehicle in," while the other two officers approached Costley with his wife, Shelvon Costley ("Mrs. Costley"). (Id.). Mrs. Costley then explained to her husband that Steiner called the Westminster Police Department, as well as Mrs. Costley and Carter, to explain that Costley was going to commit suicide. (Id. ¶ 14). Costley "immediately" stated to "everyone" that the allegation that he was going to commit suicide was "completely false." (Id.). The Officers, however, "were not trying to hear [Costley] and told him that they were going to get him some help." (Id.).

Costley attempted to reason with Lieutenant Kowalczyk, Officer Parks, and "Sgt. Darby"[5] and repeatedly stated that Steiner was lying because he had no intentions of harming himself. (Id. ¶ 15). Costley told the Officers he was not going anywhere and demanded they get off his property. But the Officers refused to listen. (Id.). When Costley proceeded to the back door of his residence, the Officers followed him and "forced their way" inside. (Id. ¶¶

---

[5] Costley refers to a "Sgt. Darby" or "Officer Darby" throughout his Complaint. Costley does not, however, name this individual as a defendant. The Court will refer to this unidentified individual as "Officer Darby" and will refer to Lieutenant Kowalczyk, Officer Parks, and Officer Darby collectively as the "Officers." The Court also notes that although Costley mentions Officer Darby in his opposition memorandum, Costley "cannot, through the use of motion briefs, amend the complaint" to add Officer Darby as a defendant. Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) aff'd, 141 F.3d 1162 (4th Cir. 1998).

15, 16).  Costley alleges the Officers had neither consent nor a warrant to enter his home.  (Id. ¶ 16).

Once Costley was inside his home with the Officers, he "felt threatened and fearful for his safety."  (Id. ¶17).  Costley made several more requests for the Officers to leave, but they refused.  (Id.).  Costley also "continuously" repeated that Steiner was lying and that he was not going to harm himself.  (Id.).  The Officers, however, told Costley he needed to go with them to the hospital for a psychiatric evaluation.  (Id.).  Costley refused, reiterating that there was nothing wrong with him, and sat down at his kitchen table.  (Id.).

While Costley was seated at his kitchen table, Lieutenant Kowalczyk told him that he had no choice but to obey the Officers and he could go willingly or "by force."  (Id. ¶ 18).  At that point, Costley was "in tears."  (Id.).  Lieutenant Kowalczyk then warned Costley that if Costley did not go willingly, Costley's home, which was once his grandmother's, may get destroyed in any ensuing struggle.  (Id.).

Costley next alleges that as result of Lieutenant Kowalczyk's "verbal t[h]reats" and the Officers' "threats to physically harm" him, Costley began to suffer an anxiety attack.  (Id. ¶ 19).  Costley took some medication and informed the Officers he needed and wanted to rest on his sofa.  (Id.).  Lieutenant Kowalczyk and Officer Parks, however, blocked the doorway leading to Costley's

4

living room.  (Id.).  Lieutenant Kowalczyk then threatened to use his taser and handcuffs if Costley did not voluntarily submit to the Officers' authority and accompany them to the hospital.  (Id.). At that point, Officer Parks "started going through [Costley's] cabinets and checking [his] medicine bottles and other prescriptions against [Costley's] will and without a warrant." (Id.).  Costley reminded Officer Parks that she did not have a warrant or consent to search his home, but she responded, "It does not matter!"  (Id.).

Costley made several phone calls "to get advice and help" with his situation because it was "clear" that the Officers were violating his rights, but no one answered.  (Id. ¶ 20).  Following these unsuccessful calls, the Officers made more threats to "harm" Costley and "destroy" his home.  (Id.).  Costley then walked outside to his back porch, and the Officers followed him.  (Id.). "Out of fear for his safety," Costley ran away from the Officers. (Id.).  As he fled, Costley fell and hit his head, left hand, and forearm on the concrete.  (Id. ¶ 21).  Costley got back on his feet and took off again, but after traveling only a few yards, he fell again.  (Id.).  This time, Costley was unable to get up and he remained on the ground until paramedics arrived to transport him to the hospital.  (Id.).  Once Costley arrived at the hospital, Officer Parks completed a petition for emergency mental health evaluation in accordance with § 10-622 of the Health-General

Article of the Maryland Code. (See ECF Nos. 7-3, 7-4). After spending twelve hours in the hospital, a psychiatrist released Costley after determining the Officers' complaint that Costley had threatened to commit suicide was "frivolous." (Id. ¶ 22).

On May 13, 2016, Costley sued the Westminster Defendants in this Court, asserting several federal and state claims arising out of the November 15, 2015 incident described above. (Compl.). Costley raises federal claims under 42 U.S.C. § 1983 for (1) illegal search and seizure, (2) excessive use of force, and (3) violation of equal protection. (Id.). He asserts state common law claims for (1) assault and battery, (2) defamation, and (3) "Abuse of Government Power and Authority," which the Court will construe as a claim for the tort of abuse of process. (Id.). Costley neither states which claims he brings against which Defendants, nor states whether he sues the Officers in their official or individual capacities.[6] Costley seeks $5 million in compensatory damages and $750,000 in punitive damages.

---

[6] Costley alleges that the Officers all work for the Westminster City Police Department. (Compl. ¶ 15). The exhibits the Westminster Defendants attach to their Motion confirm that the Officers are, indeed, Westminster Police Officers. (See ECF No. 7-3). Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. Dep't of Soc. Servs. of City of N.Y. 436 U.S. 658, 690, n.55 (1978)). Thus, since Costley also sues the City of Westminster, to the extent Costley sues the Officers in their official capacities, the Court enters judgment for the Officers on all of Costley's § 1983 claims because they are redundant. See Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (concluding

On August 24, 2016, the Westminster Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 7); it is fully briefed,[7] (see ECF Nos. 7-10, 7-12).  On October 19, 2016, the Court granted Costley's Motion to submit a cellular phone video of the November 15, 2015 incident. (ECF No. 13).  The Court received the video on October 28, 2016. (ECF No. 14).

## II.  DISCUSSION

### A.  **Standard of Review**

The Westminster Defendants style their Motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56.  A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436-37 (D.Md. 2011), aff'd sub nom., Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., 684 F.3d 462 (4th Cir. 2012).  This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d).  The Court "has 'complete discretion

---

district court correctly dismissed § 1983 claim against school board superintendent in his official capacity because the plaintiff also sued the school board).

[7] Costley's opposition memorandum is fifty-seven pages long. (ECF No. 10).  Unless otherwise ordered by the Court, opposition memoranda shall not exceed thirty-five pages, exclusive of exhibits and addenda.  Local Rule 105.3 (D.Md. 2016).  The Court, therefore,

to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion. The first is notice: the Court must give the parties some indication that it is treating the 12(b)(6) motion as a motion for summary judgment. Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). The second is a reasonable opportunity for discovery. Id.

When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The nonmovant "cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery."

_____

has not considered Costley's arguments after page 35.

<u>Harrods Ltd. v. Sixty Internet Domain Names</u>, 302 F.3d 214, 244 (4th Cir. 2002) (quoting <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 961 (4th Cir. 1996)).  Rule 56(d) provides that the Court may deny or continue a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  "[T]he failure to file an affidavit under Rule 56[(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." <u>Nguyen v. CNA Corp.</u>, 44 F.3d 234, 242 (4th Cir. 1995) (quoting <u>Paddington Partners v. Bouchard</u>, 34 F.3d 1132, 1137 (2d Cir. 1994)).

Here, the Westminster Defendants caption their Motion in the alternative for summary judgment and attach matters beyond Costley's Complaint for the Court's consideration.  Costley submits his own extra-pleading material and he has not expressed a need for discovery via a formal Rule 56(d) affidavit or an informal discovery request.  Accordingly, the Court will treat the Westminster Defendants' Motion as one for summary judgment.

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)).  Summary judgment is proper when the movant

demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(3), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is

determined by the substantive law, and "[o]nly disputes over facts
that might affect the outcome of the suit under the governing law
will properly preclude the entry of summary judgment." Anderson,
477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine"
dispute concerning a "material" fact arises when the evidence is
sufficient to allow a reasonable jury to return a verdict in the
nonmoving party's favor. Anderson, 477 U.S. at 248. If the
nonmovant has failed to make a sufficient showing on an essential
element of her case where she has the burden of proof, "there can
be 'no genuine [dispute] as to any material fact,' since a complete
failure of proof concerning an essential element of the nonmoving
party's case necessarily renders all other facts immaterial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.   Analysis**

    **1.   City of Westminster**

        **a.   Section 1983 Claims**

The Court will enter judgment for the City of Westminster on
Costley's § 1983 claims because Costley presents no facts
supporting a Monell claim.

To prevail on a § 1983 claim, a plaintiff must demonstrate a
deprivation of rights guaranteed by the Constitution or laws of the
United States and that the alleged deprivation was committed by a
"person" acting under color of state law. 42 U.S.C. § 1983; West
v. Atkins, 487 U.S. 42, 48 (1988) (citation omitted).

Municipalities, such as cities, are "persons" amenable to suit under § 1983. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). But municipalities cannot be held vicariously liable under § 1983. Id. at 691. Rather, municipalities are only liable under § 1983 when a plaintiff proves a Monell claim. See Monell, 436 U.S. at 691. To prove a Monell claim lodged against a city, a plaintiff must demonstrate that "the constitutionally offensive acts of city employees [were] taken in furtherance of some municipal 'policy or custom.'" Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir.1984) (citing Monell, 436 U.S. at 694). Because Costley does not allege, let alone present any facts, that the Officers violated his federal constitutional rights in furtherance of a policy or custom of the City of Westminster, the Court will enter judgment for the City of Westminster on all of Costley's § 1983 claims.

**b.   Common Law Claims**

The Court will enter judgment for the City of Westminster on Costley's common law claims because the City of Westminster is immune from liability.

Under Maryland law, local government entities are immune from liability for common law torts when their employees commit the torts while acting in a governmental capacity. DiPino v. Davis, 729 A.2d 354, 370 (Md. 1999). Police officers act in a governmental capacity when they enforce state criminal law. Id.

Here, the Officers were not enforcing state criminal law, but rather attempting to involuntarily commit Costley under Maryland's statute permitting emergency mental health evaluations, Md. Code Ann., Health-Gen. § 10-620, et seq. (West 2016).  While this statute is civil, not criminal, in nature, the Court finds that the Officers' actions were sufficiently similar to enforcing state criminal law to characterize them as governmental.  Accordingly, because the City of Westminster is immune from liability for the governmental actions of city police officers, the Court will enter judgment for the City of Westminster on all of Costley's common law claims.

### 2.  Officers in their Individual Capacities

#### a.  Section 1983 Claims

The Court will enter judgment for the Officers in their individual capacities on Costley's § 1983 claims because they are entitled to qualified immunity.

Costley contends that the Officers violated his Fourth Amendment right to be free from illegal searches and seizures when without a warrant or consent, they forced their way inside his home and refused to leave, searched through his cabinets and prescription bottles, and prevented him from entering his living room.  Costley further argues the Officers used excessive force when they threatened to tase him and destroy his home, including

Costley's prized family heirlooms, if he did not agree to accompany the Officers to the hospital for a mental health examination.

The Officers respond that they are protected by qualified immunity.  They argue that they had probable cause to seize Costley because their observations of Costely's behavior, coupled with information they obtained from Steiner and Mrs. Costley, led them to reasonably believe that Costley posed a danger to himself or others.  The Officers assert that their warrantless entry into Costely's home and search of his cabinets for prescription drugs was reasonable based on exigent circumstances.  The Officers further contend that they did not use excessive force against Costley because he neither alleges nor demonstrates through the factual record that the Officers used any force against him.  The Officers maintain that to the extent any of their actions could be construed as "force," the force was objectively reasonable under the circumstances.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In the Fourth Circuit, courts should apply the qualified immunity doctrine "with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of

14

judicial hindsight." Gooden v. Howard Cty., 954 F.2d 960, 964-65 (4th Cir. 1992).

Qualified immunity "is an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The United States Supreme Court has "made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" Pearson v. Callahan, 555 U.S. 223, 231-32 (2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640, n.2 (1987)).  Because the doctrine seeks to protect government officials from the burden of trial and preparing for trial, courts must resolve qualified immunity questions at the earliest possible stage in litigation. Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2009) (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

There is a two-prong test for determining whether a government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the purported violation. Pearson, 555 U.S. at 232 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  A right is "clearly established" when "it would be clear to a reasonable officer that his conduct was unlawful in the situation

15

he confronted." Cloaninger, 555 F.3d at 331 (quoting Saucier, 533 U.S. at 202).  Courts have discretion to resolve these two prongs in whatever order they consider appropriate based on the circumstances of the case at hand.  Saucier, 533 U.S. at 236.  The answers to both prongs must be in the affirmative for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds.  Batten v. Gomez, 324 F.3d 288, 293-94 (4th Cir. 2003).  The plaintiff bears the burden of proof on the first prong, Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993); the defendant on the second, Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

In Cloaninger, the Fourth Circuit outlined the framework for evaluating qualified immunity claims.  When a defendant raises a qualified immunity defense, "the court ordinarily assesses whether the plaintiff's complaint states sufficient factual allegations that, if true, show a violation of clearly established constitutional rights."  Cloaninger, 555 F.3d at 331.  But, when a defendant moves for summary judgment on qualified immunity, "an evaluation of the complaint's sufficiency is unnecessary and may unduly prolong the defendant['s] entanglement in litigation if the court can determine that the plaintiff's evidence does not support his allegations. In that circumstance, the familiar standard for summary judgment under Rule 56 applies."  Id.  Here, the Officers have moved to dismiss or, in the alternative, for summary judgment, and the Court has already concluded it will construe the Officers'

16

Motion as one for summary judgment.  Thus, the Court will apply the
Rule 56 standard to resolve whether the Officers are entitled to
qualified immunity.

### i.   Seizure

The law does not permit "random or baseless" seizures of
citizens for emergency psychological evaluations.  Gooden, 954 F.2d
at 968.  An officer violates an individual's Fourth Amendment right
to be free from unreasonable seizures when the Officer seizes the
individual without probable cause.  See Bailey v. Kennedy, 349 F.3d
731, 739 (4th Cir. 2003) (explaining that if officers did not have
probable cause to seize plaintiff for mental health evaluation,
then plaintiff asserted a violation of his Fourth Amendment right
against unreasonable seizure).  Officers possess such probable
cause when "'the facts and circumstances within their knowledge and
of which they had reasonably trustworthy information were
sufficient to warrant a prudent man' to believe that the person
poses a danger to himself or others." Cloaninger, 555 F.3d at 334
(quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

As the Fourth Circuit explained in Bailey, "[p]robable cause
is a 'practical, nontechnical conception' that addresses the 'the
factual and practical considerations of everyday life on which
reasonable and prudent men, not legal technicians, act.'"  349 F.3d
at 739 (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)).
Further, probable cause "is a 'fluid concept' that cannot be

'reduced to a neat set of legal rules.'" Id. (quoting Gates, 462 U.S. at 232).

In the Fourth Circuit, a 9-1-1 or police call from a third party reporting that an individual threatened suicide or is acting erratically, is insufficient, "without more," to establish probable cause for police officers to seize the individual for a psychological evaluation. Bailey, 349 F.3d at 740. But when officers pair the information obtained in such a call with the officers' own personal observations that the individual reasonably poses a danger to himself or others, there is probable cause for the seizure. See Gooden, 954 F.2d at 966; S.P. v. City of Takoma Park, 134 F.3d 260, 267 (4th Cir. 1998).

For example, in Gooden, officers received multiple calls from a resident of an apartment complex that a woman in an upstairs apartment was screaming. 954 F.2d at 962. Immediately after arriving at the apartment complex, the officers heard a "long, loud blood-chilling scream." Id. The officers determined that the scream was coming from the plaintiff's apartment and when they arrived there, they heard another scream coming from within. Id. After plaintiff denied she had been screaming, the officers left. Id. at 963. But shortly after leaving, the officers heard loud thuds and more screaming coming from the plaintiff's apartment. Id. According to the officers, the plaintiff appeared to be yelling in male and female voices, which indicated she might be

schizophrenic.  Id.  When the officers returned to the plaintiff's
apartment, she was unresponsive, nervous, and uncomfortable.  Id.
The officers then seized plaintiff, determining she "was a risk to
herself  and  that  a  psychiatric  evaluation  was  absolutely
necessary."  Id. at 964.  The Fourth Circuit concluded the officers
had  probable  cause  to  seize  the  plaintiff  for  a  psychiatric
evaluation because they acted on the basis of multiple complaints
from "an apartment resident whose veracity they had no reason to
doubt."  Id. at 966.  The court then emphasized that the officers
did not just act on the complaints of the other apartment resident:
"[i]ndeed, they waited until the substance of that complaint had
been  confirmed  no  less  than  three  times  by  their  personal
observations."  Id.

In S.P. v. City of Takoma Park, the plaintiff's husband called
the police following an argument with the plaintiff.  134 F.3d at
264.  The husband was connected with an emergency dispatcher, who,
following a conversation with the husband, relayed to the officers
tasked  with  responding  to  the  domestic  disturbance  that  the
plaintiff might be suicidal.  Id.  When the officers arrived at
plaintiff's home, they interviewed her before ultimately deciding
to  seize  her  for  a  mental  health  evaluation.  Although  the
plaintiff, "denied having any suicidal thoughts, being depressed,
or being under the care of a physician, she was uncooperative,
hostile,  very  upset,  and  irrational."  Id. at 267.  She also

19

"admitted that she had had a 'painful' argument with her husband and that if not for her children, she would have considered committing suicide." Id. Based on their observation, the officers seized the plaintiff for a mental health evaluation. Id. at 264. The Fourth Circuit found that the officers had probable cause to seize the plaintiff because they did not decide to detain her "in haste." Id. at 267. Instead, the officers "had ample opportunity to observe and interview [the plaintiff] before making a deliberate decision." Id.

Here, the Officers present a recording of the telephone calls from Steiner to Carroll County 9-1-1 and from Carroll County 9-1-1 to the Westminster Police Department. (See ECF No. 7-2). In Steiner's call to Carroll County 9-1-1 she says, "my son's father just called me and told me he is about to commit suicide." (Id.). She then says, "he won't tell me what he took but it's gonna [sic] be in twenty to thirty minutes." (Id.). At the end of the call, Steiner reiterates that "he said he took something and it's gonna [sic] be about twenty to thirty minutes and then he's gone." (Id.). In the call from Carrol County 9-1-1 to the Westminster Police Department, the dispatcher who spoke with Steiner relays that Steiner called and said her "child's father just texted her or called her and said he took pills and in about thirty minutes he'll be gone." (Id.). The dispatcher identifies the child's father as Costley and provides Costley's address. (Id.). The Westminster

police officer speaking with the dispatcher confirms he will send officers to Costley's residence.  (Id.).

Costley does not deny that he called Steiner on the morning of November 15, 2015, but he does deny that he told Steiner that he ingested pills to commit suicide.  Even assuming Costley has presented his denial in a form which the Court can credit for the purposes of summary judgment -- which he has not -- Costley presents no evidence to dispute that Steiner called 9-1-1 and conveyed that Costley told her he ingested pills and would be deceased within the hour.

In her affidavit, Mrs. Costley provides several statements that might lead a reasonable officer to doubt the veracity, or at least the credibility, of Steiner's statements.  (See ECF No. 10-1).  For instance, Mrs. Costley states that she has "personally witnessed [Steiner] being so unhappy with her own personal choices and being so angry and jealous of Mr. Costley's marriage and family, that she will stop at nothing to attempt to destroy and tear-apart his family and personal character."  (Id. ¶ 14).  But it is uncontroverted that the Westminster Police Department did not possess this information on November 15, 2015 when Carroll County 9-1-1 relayed the substance of Steiner's call.  As a result, the Officers, like the officers in Gooden, had no reason to doubt the veracity of Steiner's statements.

In addition to the phone recordings discussed above, the Officers present their "Offense Report" that details their observations during the incident with Costley.  (See ECF No. 7-3). Officer Parks discusses information she received from Mrs. Costley shortly after arriving at Costley's residence. Mrs. Costley shared that she was "afraid for" her husband and that less than an hour before, when the Costley's were driving home after a late night out, Costley sent Mrs. Costley a text message stating, "Too crazy for you what will you do."  (Id. at 2).  During the car ride, Costley was "acting strange" and "making 'final arrangements,'" including the manner of his burial.  (Id.).  Mrs. Costley then stated that Costley "had not been the same since the death of his grandmother" and "his mental state had been getting worse recently."  (Id.).  Mrs. Costley advised that she recently discovered Costley lying across his grandmother's grave while weeping.  (Id. at 2-3).  She also asserted that Costley had recently lost his job and a local election and was experiencing severe physical pain from two herniated disks in his back.  (Id. at 2).  Additionally, Costley was taking strong pain medication for his back and a neurologist recently placed him on an antidepressant.  (Id.).

In her affidavit, Mrs. Costley denies that she told Officer Parks that she found her husband lying across his grandmother's grave.  (ECF No. 10-1 ¶ 12).  She also states that she and her

22

husband simply discussed final arrangements "in general" -- Costley did not "mak[e]" any final arrangements.  (Id. ¶ 11).  Notably, Mrs. Costley does not dispute that she told Officer Parks she was "afraid for" her husband or that Costley's mental state was deteriorating and he was taking an antidepressant.

In the Offense Report, Officer Parks goes on to discuss her interaction with Costley, who purportedly arrived home after Officer Parks spoke with Mrs. Costley.  Officer Parks describes Costley as "hostile" toward the Officers and "verbally uncooperative."  (ECF No. 7-3 at 3).  Costley also appeared emotionally unstable: he "was at one moment angry and the next minute crying."  (Id.).  What is more, Costley "made statements that he had destroyed his life and it was over."  (Id.).  In his narrative supplement to the Offense Report, Lieutenant Kowalczyk confirms that Costley was mentally and emotionally unhinged: "At times Mr. Costley would sit with tears going down his face then he would become angry again and start making threats that he was not going with us[,] that he was going to sue us[,] and that we would have to fight with him."  (Id. at 5).

Costley presents no evidence to dispute that he was behaving in the manner that the Officer described in the Offense Report or that he made statements that his life was over.  Other than the affidavit from his wife -- which does not dispute Officer Parks's description of Costley's mental or emotional state during the

interaction with the Officers -- Costley only presents a cell phone recording of his interaction with the Officers and what appears to be a print-out of the Westminster Police Department's webpage that discusses the qualifications for police officers.  Significantly, Costley does not assert that the cell phone recordings capture the entire exchange between Costley and the Officers.  And the Court's review of the recordings confirms that they, in fact, do not encompass the entire interaction because they do not include the part when Costley allegedly went out to his back porch and then ran from the Officers.  (See Compl. ¶¶ 20-21).  During the portion of the incident which the recordings do cover, Costley was, indeed, verbally uncooperative with the Officers.  The Court, however, need not evaluate whether Costley's conduct rises to the level of hostility or emotional instability because by not capturing the entire exchange, the recordings do not dispute Officer Parks's observations that Costley behaved in that manner.

In sum, it is uncontroverted that the Westminster Police Department received information that Steiner called 9-1-1 to alert the dispatcher that Costley said he ingested pills and would be "gone" within the hour.  There is no evidence to suggest that the Westminster Police Department should have questioned the veracity or credibility of Steiner's statements.  Like the officers in S.P., the Officers did not seize Costley "in haste," but rather they "had ample opportunity to observe and interview [Costley] before making

a deliberate decision." 134 F.3d at 267. Even Mrs. Costley asserts that the Officers' interaction with Costley lasted over forty-five minutes. (See ECF No. 10-1 ¶ 6). And, like the officers in both Gooden and S.P., the Officers did not rely on Steiner's call alone. Rather, they coupled the information from the call with their own observations gleaned from an interview with Mrs. Costley and a protracted verbal exchange with Costley himself. It is undisputed that Mrs. Costley was afraid for her husband because his mental state was deteriorating after the death of his grandmother, he was acting strange the morning of the incident, he recently lost his job, and he was taking strong pain medications and an antidepressant. It is further undisputed that the Officers observed that Costley was hostile, verbally uncooperative, and emotional unstable, and that he said his life was over.

Considering all the uncontroverted evidence in this case, the Court concludes the Officers had probable cause to seize Costley for a psychiatric evaluation.

While the Officers had probable cause to seize Costley, it is a separate question whether the Officers had probable cause to seize him inside his home. Officers are only permitted to seize a person inside his home if they have a warrant or there are exigent circumstances. Payton v. New York, 445 U.S. 573, 590 (1980). "Exigent circumstances exist when there is 'a risk of danger to the police or to other persons inside or outside the dwelling . . . .'"

25

<u>Cloaninger</u>, 555 F.3d at 334 (quoting <u>United States v. Moses</u>, 540 F.3d 263, 270 (4th Cir. 2008)).  In <u>Cloaninger</u>, the Fourth Circuit concluded there were exigent circumstances to justify a warrantless seizure of the plaintiff inside his home because knowledge of prior suicide threats and possession of firearms established to an objectively reasonable officer that the plaintiff was a danger to himself.  <u>Id.</u>  Here, though there is no evidence that Costley kept firearms in his home, it is undisputed that Steiner reported Costley had threatened suicide, Mrs. Costley stated she was afraid for her husband, and Costley remarked that he had destroyed his life and it was over.  Under these circumstances, an objectively reasonable officer could conclude Costley was a danger to himself.  The Court, therefore, concludes that there were exigent circumstances and the Officers did not violate Costley's Fourth Amendment rights when they seized him inside his home.  Accordingly, the Court finds as a matter of law that the Officers are entitled to qualified immunity for the seizure.

### ii.  Search

Costley also asserts the Officers violated his Fourth Amendment right to be free from unreasonable, warrantless searches when they searched through his cabinets to look for prescription drugs.  The Officers argue they are protected by qualified immunity because the right to be free from unreasonable searches performed in relation to a seizure for mental health evaluation was not

clearly defined when the Officers performed their search.   The
Court agrees.

Costley cites no case, and this Court finds none, in which the
Fourth Circuit has defined the contours of the right to be free
from a warrantless search of one's cabinets when officers have
reason to believe a resident may have ingested a lethal dose of
prescription drugs.   In fact, the Court finds no case in which the
Fourth Circuit has even dealt with a warrantless search of a home
conducted in relation to a seizure for a psychological evaluation.
In the absence of case law clearly establishing the right that the
Officers allegedly violated, the Court finds that no reasonable
officer would have understood whether searching Costley's cabinets
violated Costley's constitutional rights.   The Court, therefore,
concludes that the Officers are entitled to qualified immunity on
Costley's claim for an unlawful search.

### iii. Excessive Use of Force

Costley further maintains that the Officers used excessive
force when they seized him.   Costley's claim is subject to the
defense of qualified immunity, Slattery v. Rizzo, 939 F.2d 213, 216
(4th Cir. 1991), and it is analyzed under the Fourth Amendment, see
Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (quoting
Graham v. Connor, 490 U.S. 386, 395 (1989)).   To determine whether
the Officers used excessive force against Costley, the Court will
consider   whether   the   Officers'   actions   were   "'objectively

reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.  These "facts and circumstances" include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 396.  The Court may also consider the extent of the plaintiff's injuries.  See Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).

Under the facts and circumstances of this case, the Officers are entitled to qualified immunity because they did not use excessive force when seizing Costley.  While Costley had not committed any crimes, all other factors weigh in favor of finding a constitutionally permissible seizure.  The Officers possessed information from Steiner's call that Costley posed an immediate threat to himself because he may have already ingested a fatal dose of prescription drugs.  The Officers' written descriptions of their interaction with Costley and his own cell phone recordings show indisputably that Costley was actively defying the Officers' attempts to have Costley peacefully accompany them to the hospital for an evaluation.  The record is also undisputed that Costley fled after the Officers permitted him to leave the house to smoke a cigarette and make some phone calls.  As for injuries, Costley merely alleges that while he was fleeing from the Officers he "fell

hitting his head, left hand[,] and forearm on the concrete."
(Compl. ¶ 21).  He also alleges that when he arose from the first
fall, he started to run again, but he only made it a few yards
before he "fell again landing directly on his left side" and "was
unable to get up from this fall."  (Id.).  But Costley presents no
evidence that he suffered any physical injuries from his
interaction with the Officers.

What is more, Costley neither alleges nor offers any evidence
that the Officers made any physical contact with him.  In her
affidavit, Mrs. Costley affirms her husband's allegations that the
Officers threatened to destroy family heirlooms in Costley's home
and tase him if he did not follow their orders.  (ECF No. 10-1 ¶
6).  But she does not maintain that the Officers actually destroyed
any of Costley's property or that they made physical contact with
him.  See Robertson v. City of Beckley, 963 F. Supp. 570, 575
(S.D.W.Va. 1997) (concluding defendants were entitled to summary
judgment on their claim for excessive use of force because it was
undisputed that defendants neither made physical contact with
plaintiff nor broke or damaged any personal property); see also
Jackson v. City of N.Y., 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013)
(granting summary judgment for defendants on plaintiffs' claim for
excessive use of force because it was undisputed that defendants
did not make physical contact with plaintiffs).

Because the Officers are entitled to qualified immunity, the Court will enter judgment for the Officers on Costley's claim for excessive use of force.

### iv. Equal Protection

In Costley's fourth and final § 1983 claim, he asserts the Officers violated the Fourteenth Amendment's guarantee of equal protection under the law.  The Equal Protection Clause "does not take from the States all power of classification," but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal citation omitted) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  To succeed on his equal protection claim, Costley "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  Id. at 730–31 (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).  "If he makes this showing, 'the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" Id. at 731 (quoting Morrison, 239 F.3d at 654).  Here, Costley fails to allege, let alone present evidence, that the Officers treated him differently from others with whom he is similarly situated.  Thus, Costley's equal protection claim fails and the Officers are entitled to judgment as a matter of law.

### b.  Common Law Claims

The Court will enter judgment for the Officers on all of Costley's common law claims because the Officers are immune from liability.

Costley asserts that the Officers committed three common law torts: (1) defamation; (2) abuse of process; and (3) assault and battery.  The Officers argue they are immune from liability because it is undisputed that they complied with § 10-622 of the Health General Article ("HG") of the Maryland Code, Maryland's statute governing petitions to seize an individual for an emergency psychiatric evaluation.  The Court agrees.

Under HG § 10-622, a petition for emergency evaluation may be made if the petitioner has reason to believe that an individual "[h]as a mental disorder" and "presents a danger to the life or safety of the individual or others."  HG § 10-622(a) (West 2016). A petitioner may base the petition on "examination or observation" or "[o]ther information obtained that is pertinent to the factors giving rise to the petition."  Id. § 10-622(b)(2).  Local police officers are defined as "peace officers" within this statutory scheme, see id. § 10-620(f), and they are expressly permitted to submit petitions, see id. § 10-622(b)(1)(ii).  Importantly, "any peace officer who acts as a custodian of an emergency evaluee shall have the immunity from liability described under § 5-624(c) of the Courts and Judicial Proceedings Article ["CJP"]."  Id. § 10-629(b).

That section of the Court and Judicial Proceedings Article provides that, "[a]ny peace officer who, in good faith and with reasonable grounds, acts as a custodian of an emergency evaluee is not civilly or criminally liable for acting as a custodian." CJP § 5-624(c) (West 2016). The Fourth Circuit has recognized that while CJP § 5-624(c) "appears, at a minimum, to protect an officer from claims such as false imprisonment based on the act of taking the evaluee into custody, it does not appear to offer an officer blanket immunity for anything and everything that might occur <u>after</u> the evaluee is taken into custody. <u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 578 (4th Cir. 2001) (emphasis added).

Considering the undisputed evidence in this case that the Court discussed at length above, the Court finds that the Officers acted in good faith and with reasonable grounds when they concluded based on their observations and the call from Steiner that Costley had a mental disorder and was a danger to his own life. Because Costley alleges that the Officers committed defamation, abuse of process, and assault and battery during -- not after -- the seizure, the Court concludes as a matter of law that the Officers are immune from Costley's common law claims. <u>See</u> <u>Young</u>, 238 F.3d at 578. Accordingly, the Court will enter judgment for the Officers on those claims.

## III. CONCLUSION

For the foregoing reasons, the Court will GRANT the Westminster Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 7). A separate Order follows.

Entered this 4th day of January, 2017

/s/

_____
George L. Russell, III
United States District Judge